# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA LOWRY,<br><br>                      Plaintiff,<br>   vs.<br><br>CITY OF SAN DIEGO,<br><br>                      Defendant. | CASE NO. 11-CV-946-MMA(WMC)<br><br>**ORDER GRANTING DEFENDANT CITY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 50] |

    Plaintiff Sara Lowry ("Plaintiff") brings this civil rights action against Defendant City of San Diego (the "City"), seeking to hold the municipality liable for promulgating a "bite and hold" dog apprehension policy that violated her Fourth Amendment rights. The City moves for summary judgment in its favor as to Lowry's single claim under *Monell v. New York Dep't of Soc. Services*, 436 U.S. 658 (1978). *See* Doc. No. 50. With leave of court, Plaintiff filed an untimely opposition to the motion, to which the City replied. *See* Doc. Nos. 57, 62. For the reasons set forth below, the Court **GRANTS** the City's motion.

///
///
///
///
///

## FACTUAL BACKGROUND

This action arises out of events occurring on a Thursday night in the Pacific Beach neighborhood of San Diego.[1] Plaintiff Sara Lowry worked for Tenzing Corporation ("Tenzing"), located at 4603 Mission Boulevard, Suite 201. On the evening in question, Plaintiff visited two local bars after work with friends. [Lowry Dep. 3:20-5:10, Doc. No. 50-3.] Plaintiff consumed five vodka drinks between 6:00 p.m. and 9:30 p.m. [*Id.*] Plaintiff then returned to the Tenzing office to retrieve her leftovers from lunch; however, upon arrival, she decided to stay and sleep on the office couch. [*Id.* at 6:11-23; 7:8-11; 8:10-19.] Plaintiff awoke needing to use the bathroom. [*Id.* at 9:3-9.] During business hours, Plaintiff used an interior bathroom in the adjoining office, Suite 200, occupied by Drew George & Partners (DGP). [*Id.* at 10:22-25; 11:8; 12:3-7.] Plaintiff unlocked the adjoining interior door to DGP, setting off DGP's alarm system.[2] [*Id.* at 9:6-9; Kreber Decl. ¶ 2, Doc. No. 50-27.] Realizing "it wouldn't be right for [her] to use [the interior bathroom] at night," she immediately closed the door and used an exterior public bathroom instead. [Lowry Dep. 10:23-24; 12:8-16.] Plaintiff then went back inside Tenzing and fell asleep. [*Id.* at 9:8-9.] Both suites and the public bathroom are on the second floor; a balcony is used to move from one door to the next. [*Id.* at 24:12-16; Nulton Decl. ¶ 5, Doc. No. 50-19.]

Shortly before 11:00 p.m., the San Diego Police Department (SDPD) received notification from ADP Security Services that a burglar alarm had activated at 4603 Mission Boulevard, Suite 200. [Kreber Decl. ¶¶ 1-2.] SDPD Officers Bill Nulton ("Sergeant Nulton"), Mike Fish and David Zelenka, along with a police canine, arrived to the scene within minutes. [Fish Decl. ¶¶ 2-3, Doc. No. 50-23; Nulton Decl. ¶¶ 2-3; Zelenka Decl. ¶¶ 2-3, Doc. No. 50-15.] The officers did not see

---

[1] The facts recited herein are not reasonably in dispute unless otherwise noted.

[2] The parties dispute whether the alarm was audible on site. However, this fact is immaterial to resolution of this motion.

1  anyone leaving the site as they approached.  [Nulton Decl. ¶ 8.]  The officers
2  checked the north, south, and west sides of the building and did not see any broken
3  windows or other points of entry into the building.  [Nulton Decl. ¶ 3; Zelenka Decl.
4  ¶ 3.]  On the east side of the building, however, the officers noticed that the door to
5  Tenzing (Suite 201) was open,[3] providing the only entry point into the building.
6  [Fish Decl. ¶ 4; Nulton Decl. ¶¶ 5-6; Zelenka Decl. ¶ 4.]  To reach the second story,
7  Officer Fish scaled a locked exterior gate, which he then opened to allow Nulton,
8  Zelenka, and the canine to enter.  [Fish Decl. ¶ 4; Zelenka Decl. ¶ 4.]
9       The officers could not see into the interior of Tenzing because it was
10 completely dark but for the ambient light shining through from the parking lot.[4]
11 [Fish Decl. ¶ 6; Nulton Decl. ¶ 6; Zelenka Decl. ¶ 6.]  The officers could not see any
12 movement inside Tenzing.  [Fish Decl. ¶ 4; Nulton Decl. ¶ 4; Zelenka Decl. ¶ 4.]
13 Because the lights were out and the door propped open, the officers suspected that
14 whoever tripped the alarm was inside the building lying in wait or unsure of what to
15 do next.[5]  [Fish Decl. ¶ 8; Nulton Decl. ¶ 8; Zelenka Decl. ¶ 8.]  The door to DGP
16 (Suite 200) was closed and locked and the office was dark.  [Nulton Decl. ¶ 5.]
17 Sergeant Nulton saw a sign posted on Tenzing's door instructing that all deliveries

---

[3] Plaintiff contests the fact that the door was open.  She testified during her deposition that she knows the door was closed because "[the door] closes automatically."  [Lowry Dep. 33:19.]  To the extent Plaintiff argues that her testimony creates a genuine issue of material fact, the Court finds that it does not.  Plaintiff does not testify that she actually closed the door, but speculates that it did close because she knew it to be an automatically closing door.  Thus, she fails to offer admissible firsthand testimony.

[4] Plaintiff disputes the brightness level inside Tenzing at the time of the incident. However, Plaintiff does not present any evidence showing that there is a genuine issue of fact on this point.  Instead, her claims as to the brightness of Suite 201 are entirely speculative.

[5] Plaintiff argues that the City has not cited any admissible evidence to demonstrate that a burglar was present or that an alarm had been tripped.  Yet it is undisputed that Dianne Kreber, a police dispatcher, received a call from ADT Security Services reporting that an audible burglar alarm had been triggered at Suite 201. [Kreber Decl. ¶¶ 2.]  It is also undisputed that the officers were told when dispatched that a burglar alarm had been activated.

were to be made to Suite 200.[6]  [Nulton Decl. ¶ 6.]  This led Sergeant Nulton to believe that Suites 200 and 201 were connected or part of the same business. [*Id.*]

The officers believed that whoever triggered the burglar alarm was still inside the building because the officers arrived on scene so quickly and they did not see anyone leaving the site as they arrived.  [*Id.* ¶ 8.]  The officers did not know whether whoever was inside the building was armed.  [Fish Decl. ¶ 9; Nulton Decl. ¶ 9; Zelenka Decl. ¶ 9.]  At Tenzing's front door, Sergeant Nulton, the canine handler, loudly yelled: "This is the San Diego Police Department! Come out now or I'm sending in a police dog! You may be bitten!"[7]  [Fish Decl. ¶ 7; Nulton Decl. ¶ 7; Zelenka Decl. ¶ 7.]  Sergeant Nulton repeated the warning two or three times, waiting between warnings to give any occupants an opportunity to come out.  [*Id.*]  He received no response.  [*Id.*]  Because no one responded, the officers believed that whoever triggered the alarm ran away, was hiding, or was under duress.  [Fish Decl. ¶ 9; Nulton Decl. ¶ 9; Zelenka Decl. ¶ 9.]

Thereafter, Sergeant Nulton released the police canine to clear the suite.  [Fish Decl. ¶ 11; Nulton Decl. ¶ 11; Zelenka Decl. ¶ 11.]  As he followed closely behind the dog, Sergeant Nulton used his flashlight to sweep the area.  [Nulton Decl. ¶ 12.]  He spotted a purse with the contents strewn across an office floor.  [*Id.*]  He then shined his flashlight against one of the office walls where he saw a lump on a sofa.  [*Id.*]  He could not tell what gender the person was or whether he or she was armed.  [*Id.*]  The instant he saw the lump, he saw the canine jump into the flashlight beam and onto the lump.  [*Id.*]  He immediately called the dog off.  [*Id.*]  In the process, the dog scratched or bit Plaintiff's upper lip.  [Lowry Dep. 43:24-44:24.]  The entire

---

[6] Plaintiff disputes the presence of the sign by citing the declarations of Fish and Zelenka in which they testified they could not recall if there was a sign on Tenzing's door.  However, they did not testify that there was no sign, only that they could not recall there being one.  Officer Nulton, on the contrary, affirmatively testified that a sign was posted on Tenzing's door.

[7] Plaintiff disputes whether Sergeant Nulton called out a verbal warning. However, Plaintiff lacks proper foundation to testify to this fact because she was sleeping at the time.  [*See* Lowry Dep. 35:8-9; 36:12-17.]

encounter was "very quick." [*Id.* at 37:21.] Officer Fish confirmed that Plaintiff worked at Tenzing, and then transported her to the hospital where doctors gave her three stitches. [Fish Decl. ¶ 13; Lowry Dep. 22:20.]

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hubbard v. 7-Eleven*, 433 F. Supp. 2d 1134, 1139 (S.D. Cal. 2006), citing former Fed. R. Civ. P. 56(c)(2). "The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact." *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted). "Once the moving party meets its initial burden, . . . the burden shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (internal quotation marks and citations omitted).

A mere scintilla of evidence is not sufficient "to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997), quoting *Anderson*, 477 U.S. at 249, 252. Thus, in opposing a summary judgment motion, it is not enough to simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). However, when assessing the record to determine whether there is a "genuine issue for trial," the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in his favor." *Horphag*, 475 F.3d at 1035 (citation omitted). On summary judgment, the Court may not make credibility determinations; nor may it weigh conflicting evidence. *See*

*Anderson*, 477 U.S. at 255. Thus, as framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

## SECTION 1983 MUNICIPAL LIABILITY

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

A local governmental entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In order to establish liability for governmental entities under *Monell*, a plaintiff must prove: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). A single occurrence of unconstitutional action by a non-policymaking employee is insufficient to establish the existence of an actionable municipal policy or custom. *See Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989). "Only if a plaintiff shows that his injury resulted from a permanent and well settled practice may liability attach for injury resulting from a local government custom." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) (quotations

omitted).  "Where a plaintiff claims that the municipality has not directly inflicted injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable for the actions of its employee."  *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 405 (1997).

## DISCUSSION

### A.  *Plaintiff Suffered No Constitutional Injury*

In order for the City to have any potential liability in this case, Plaintiff must have suffered a constitutional injury.  A determination that Plaintiff suffered no constitutional injury is dispositive of her municipal liability claim against the City.  As the Supreme Court observed in *City of Los Angeles v. Heller*, 475 U.S. 796 (1986):

> [N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the [court] has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

*Id.* at 799 (original emphasis).

Here, Plaintiff's claim against the City is rooted in her allegation that the officers' warrantless search of Suite 201 was unreasonable under the Fourth Amendment.  Plaintiff argues additionally that the officers used excessive force in violation of the Fourth Amendment by allowing the police dog to subdue her.

### 1.  **The Warrantless Search Was Reasonable**

The United States Constitution protects individuals from unreasonable searches. U.S. Const. amend. IV.  "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'"  *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

1    The exigent circumstances exception allows police officers to make a
2 warrantless entry if (1) they have probable cause to believe that a crime has been or
3 is being committed; and (2) exigent circumstances exist justifying the warrantless
4 intrusion. *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001).  Probable
5 cause requires only a fair probability or substantial chance of criminal activity, and
6 is determined by looking at "the totality of the circumstances known to the officers
7 at the time." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)  Exigent
8 circumstances include situations involving (1) the need to prevent physical harm to
9 the officers or other persons; (2) the need to prevent the imminent destruction of
10 relevant evidence; (3) the hot pursuit of a fleeing suspect; (4) the need to prevent the
11 escape of a suspect; or (5) some other consequence improperly frustrating legitimate
12 law enforcement efforts. *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir.
13 2010).  The government "bears the burden of showing specific and articulable facts
14 to justify the finding of exigent circumstances." *United States v. Ojeda*, 276 F.3d
15 486, 488 (9th Cir. 2002).

16    Here, the officers' entry into Suite 201 was clearly permitted under the
17 exigent circumstances doctrine.  The officers were dispatched to investigate a
18 potential burglary after a security alarm activated.  They arrived on scene within
19 minutes.  The officers did not seen anyone leaving the building or parking lot as they
20 approached.  The door of an adjoining suite was ajar.  The office building was
21 completely dark.  In their declarations, all three officers expressed concern that
22 someone had been forced into the suite by a burglar or that someone activated the
23 burglar alarm in an attempt to summon help.  The officers did not know if the
24 perpetrator was armed.  Considering the totality of the circumstances, the officers
25 faced a fair probability that something was amiss inside the suite and acted
26 reasonably by entering the suite to look for a possible victim or perpetrator.  "The
27 fact that the officers' suspicions were wrong does not alter our view that the
28 circumstances known to them . . . justified all of their actions." *Murdock v. Stout*, 54

F.3d 1437, 1444 (9th Cir. 1995).

### 2. The Officers Did Not Use Excessive Force

"Claims of excessive . . . force are analyzed under the Fourth Amendment's reasonableness standard." *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In determining whether the dog bite was "objectively reasonable" as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," the Court must consider several factors. *Graham*, 490 U.S. at 396-97. First, the Court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. Second, the Court must assess the importance of the countervailing governmental interests at stake. *Id.* at 396.

#### a. Intrusion on Constitutional Rights

A court "assesses the gravity of the intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Miller v. Clark County*, 340 F.3d 959, 966 (9th Cir. 2003). In the instant case, Plaintiff was scratched or bit by the police dog in a "very quick" encounter. She received three stitches for her injury. Plaintiff cites *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994), to support her contention that a dog bite constitutes severe force. *Chew*, however, did not categorically determine that all canine-inflicted injuries are severe or incontrovertibly unconstitutional. There, a police dog was sent to locate a concealed suspect and was out of the handler's sight. *Id.* at 1441. As a result, the handler could not stop the dog's attack. *Id.* The dog dragged Chew up to ten feet from his hiding place, bit him multiple times, and "nearly severed" Chew's arm. *Id.* at 1441. Thus, the force inflicted on Chew was deemed severe. *Id.*

This case is distinguishable. Here, the dog's handler, Sergeant Nulton, was present and immediately called the dog off upon seeing Plaintiff on the couch. In Plaintiff's own words, the overall encounter was "very quick." Based on the limited

duration of the force and the slight injury sustained, the Court finds that the force inflicted was moderate.

### b. Governmental Interests

Next, the Court must assess the importance and legitimacy of the government's countervailing interests. The three factors pertinent to this inquiry are: (1) the severity of the crime the suspect is believed to have committed; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Additionally, the Ninth Circuit has held that whether a warning was given before the use of force is a factor that may be considered in applying the *Graham* balancing test. *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001).

### i. Severity of the crime

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle*, 272 F.3d at 1280. In this case, the officers were tasked with investigating an apparent late-night burglary. Under California law, burglary is an aggravated felony. *See United States v. Alcala-Sanchez*, 666 F.3d 571, 573 (noting that burglary is an aggravated felony under California Penal Code § 459). Under these circumstances, "[t]he government has an undeniable legitimate interest in apprehending criminal suspects . . . and that interest is even stronger when the criminal is . . . suspected of a felony." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The Ninth Circuit, however, has also cautioned that a "wide variety of crimes, many of them nonviolent, are classified as felonies." *Chew*, 27 F.3d at 1442. Yet, as the Supreme Court has stated, "[b]urglary is dangerous because it can end in confrontation leading to violence." *Sykes v. United States*, 131 S. Ct. 2267, 2273 (2011). Therefore, the Court finds that the seriousness of the suspected crime weighs solidly in favor of the government.

### ii. Threat to the safety of the officers and public

"[T]he most important single element of the three specified factors [is] whether the suspect poses an immediate threat to the safety of the officers or others." *Chew*, 27 F.3d at 1441. In this case, the burglary suspect created a safety threat for the officers. The officers were searching for an unknown suspect at night. They did not know whether the suspect was armed. A door leading into the apparently burgled building was ajar, but no lights were on inside. Under these circumstances, the officers reasonably and objectively feared for their safety and any possible hostage's safety. Thus, the Court finds this factor unequivocally favors the government.

### iii. Resisting or evading arrest by flight

The third factor under *Graham* is whether the suspect actively resisted arrest or attempted to evade arrest by flight. While Plaintiff did not actively and physically resist arrest, she also did not respond to Sergeant Nulton's commands to exit the darkened suite. Plaintiff may not have heard Sergeant Nulton's warnings, but this does not contradict the evidence establishing that warnings were voiced. Based on the circumstances, the officers could reasonably believe that the suspect was ignoring their commands, thereby evading arrest. The Court concludes this factor weighs slightly in favor of the government.

### iv. Presence of a warning

"[T]he giving of a warning or failure to do so is a factor to be considered in applying the *Graham* balancing test." *Doerle*, 272 F.3d at 1284. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Id.* In this case, it is undisputed that Sergeant Nulton gave several vocal warnings prior to releasing the police dog. That Plaintiff, in her sleep, did not hear the warnings is immaterial. This factor weighs in favor of the government.

### c. Weighing the Conflicting Interests

The Court must now consider the "dispositive question of whether the force that was applied was reasonably necessary under the circumstances." *Miller*, 340 F.3d 966. Under the circumstances known to Sergeant Nulton, use of the police dog was well suited to search for and detain the burglary suspect. Each *Graham* factor analyzed above weighed either in favor or slightly in favor of the government. From an objective standpoint, the use of a canine to search for and detain a suspected felon, who is hiding in the dark and possibly armed, is not unreasonable. Further, the intrusion on Plaintiff's constitutional rights was moderate. Plaintiff fails to present any facts to demonstrate that the officers could have safely and reasonably investigated the situation without using the police dog.[8] There are similarly no facts to contradict the evidence that Sergeant Nulton ordered the dog off Plaintiff immediately upon realizing that she was lying on the couch. Therefore, the Court concludes that the government's interest in deploying the police dog outweighs Plaintiff's interest, and the use of the police dog was reasonable under the circumstances. Thus, Plaintiff has suffered no constitutional injury.

### B. *The City's Bite and Hold Apprehension Policy is Constitutional*

Because the Court finds that there was no constitutional violation, there can be no *Monell* liability. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (stating that whether "the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point" where there is no

---

[8] On this point, Plaintiff argues that the officers could have observed her through the window overlooking the couch where she slept. [Pl's Opp. at 7.] She also argues that had the officers used their flashlights to look through the window, they may have seen Plaintiff asleep on the couch. [*Id.* at 14.] The City argues that such a practice creates an unsafe situation for officers ("silhouetting"), as anyone inside the suite would not be seen, but he or she would be able to see the officers standing outside the window looking in. The Court finds that it is pure speculation that the officers could have peered through the window into a darkened office to spot Plaintiff on the couch. Further, Plaintiff's argument violates the prohibition against applying the 20/20 vision of hindsight in determining the reasonableness of an officer's actions. *See Graham*, 490 U.S. at 396 (stating that the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

constitutional violation). Yet even if there had been a constitutional violation, municipal liability would not apply because Plaintiff has provided no evidence that the SDPD had any policy or practice of violating the civil rights of citizens. Plaintiff has presented no evidence of an unconstitutional policy or custom of the City with respect to the use of force by police, nor has she presented evidence of a pattern of uses of excessive force by SDPD officers which have gone unpunished. *Bemis v. Edwards*, 45 F.3d 1369, 1374-75 (9th Cir. 1995); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).

Plaintiff argues that the City's bite-and-hold policy is facially unconstitutional "given the lack of control police exercise over their police canines, the inherently dangerous nature of these canines, and the serious risk to the public and innocents the canines encounter." [Opp. at 14.] In support of this argument, Plaintiff submits a declaration from Richard H. Polsky, Ph.D., a certified applied animal behaviorist. According to Dr. Polsky, Sergeant Nulton's decision to deploy the dog off-lead created a dangerous decision for any civilian in the building during the dog's search.[9] [Polsky Decl., Doc. No. 57-8 at 5.]

Plaintiff's argument, however, finds no support in case law, and Plaintiff presents no evidence that the City's policies expressly authorized an unconstitutional dog attack. The Ninth Circuit has noted that:

> [w]hen the incident that led to the filing of this lawsuit occurred, the use of police dogs to search for and apprehend fleeing or concealed suspects constituted neither a new nor a unique policy. The practice was long-standing, widespread, and well-known. No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful. At the time of the incident in question, the only reported case which had considered the constitutionality of such a policy had upheld that practice.

*Chew v. Gates*, 27 F.3d 1432, 1447 (9th Cir.1994), citing *Robinette v. Barnes*, 854

---

[9] The City argues that Dr. Polsky's declaration should be excluded because there is no showing that he has any experience with police dogs or police procedures. Thus, the City argues his testimony is irrelevant and lacks a proper foundation. [Reply at 7-8.] The Court will not engage in a comprehensive *Daubert*-style analysis at this time, as it finds that Dr. Polsky's declaration is not determinative to this motion.

F.2d 909 (6th Cir. 1988). Four years after its decision in *Chew*, the Ninth Circuit reiterated in *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998), that since *Chew* "there had been no change in the law that would have alerted [the defendant] that his use of a police dog to search and bite was unconstitutional." *Id*. at 1092. Thus, the Court finds that as a matter of law, the City's bite-and-hold policy is constitutional.

Plaintiff also cites three other SDPD policies[10], but does not offer any facts or legal authority to support the conclusion that these policies are unconstitutional or otherwise were the cause of a constitutional violation.

Finally, Plaintiff presents no evidence establishing a custom, practice, or policy of constitutional violations by the City. Instead, Plaintiff's allegations tell of an isolated incident, affecting her alone. "Proof of random acts or isolated events are insufficient to establish custom." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989).

There are no genuine issues of material fact regarding Plaintiff's *Monell* claim. Plaintiff's claim fails as a matter of law because Plaintiff has not suffered a constitutional injury. Furthermore, even had Plaintiff suffered a constitutional injury, she has not presented facts establishing that the SDPD has a policy amounting to the deliberate indifference to Plaintiff's constitutional rights, or that similar violations beyond this lawsuit have occurred. Accordingly, the Court **GRANTS** the City's motion for summary judgment.

/ / /

/ / /

---

[10] First, Plaintiff avers that SDPD's policy wherein officers are trained to not use flashlights to look in windows to protect themselves from suspects inside darkened buildings is unreasonable. Second, Plaintiff argues that SDPD canine handlers, including Sergeant Nulton, have been trained to release their canines off-lead where the handler could have followed the dog on-lead while conducting the search without decreasing the canine's effectiveness. Third, Plaintiff argues that SDPD's policy of requiring only two warnings prior to deploying a canine is unreasonable. [Opp. at 14-15.]

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** the City of San Diego's motion for summary judgment. The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

DATED: May 31, 2013

*/s/ Michael M. Anello*

Hon. Michael M. Anello
United States District Judge